IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JOE BARRY CARROLL,

               Plaintiff,

     v.

THE TAVERN CORP. and
CENTRAARCHY RESTAURANT
MANAGEMENT CO.,

          Defendants.

CIVIL ACTION FILE

NO. 1:08-CV-2514-TWT-JFK

JOSEPH SHAW,

               Plaintiff,

     v.

THE TAVERN CORP. and
CENTRAARCHY RESTAURANT
MANAGEMENT CO.,

          Defendants.

CIVIL ACTION FILE

NO. 1:08-CV-2554-TWT-JFK

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

In August of 2008, Plaintiffs Joe Barry Carroll and Joseph Shaw filed the above-styled complaints against Defendants CentraArchy Restaurant Management Co. ("CentraArchy") and The Tavern Corp. ("the Tavern"). [1:08-CV-2514, Doc. 1; 1:08-CV-2554, Doc. 1]. Plaintiffs Carroll and Shaw contend that Defendants subjected them to racial discrimination in a place of public accommodation in violation of 42

U.S.C. § 2000a ("Title II") and racial discrimination in contractual relations in violation of 42 U.S.C. § 1981. [1:08-CV-2514, Doc. 74; 1:08-CV-2554, Doc. 1]. In addition to Plaintiffs' federal claims, Plaintiff Carroll has asserted state law claims of intentional infliction of emotional distress, tortious misconduct, negligent or reckless infliction of emotional distress, and wrongful eviction. [1:08-CV-2514, Doc. 74 at 15-18]. Now pending before the court are Defendants' motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. [1:08-CV-2514, Doc. 112; 1:08-CV-2554, Doc. 100]. Also submitted to the court are a motion [1:08-CV-2514, Doc. 154] to strike filed by Defendants and a motion [1:08-CV-2514, Doc. 155] for an extension of time and a motion [1:08-CV-2514, Doc. 157] to allow late-filed evidence filed by Plaintiff Carroll.

On May 27, 2010, the undersigned issued a report and recommendation on Defendants' summary judgment motions. [1:08-CV-2514, Doc. 148; 1:08-CV-2554, Doc. 120]. The report and recommendation was submitted to the district court which noted that on the issue of the legal standard for showing a *prima facie* case of discrimination under 42 U.S.C. § 1981, there is a lack of controlling Eleventh Circuit precedent. [1:08-CV-2514, Doc. 158; 1:08-CV-2554, Doc. 122]. The district court also noted that the caselaw on this question is conflicting in other circuits and within

2

the Northern District of Georgia.  The undersigned used the *prima facie* elements set forth in Christian v. Wal-Mart Stores, Inc., 252 F.3d 862 (6th Cir. 2001), and Brooks v. Collis Foods, Inc., 365 F. Supp. 2d 1342 (N.D. Ga. 2005).  This standard allows a plaintiff to establish a *prima facie* case of discrimination by showing *inter alia* that he received services in a markedly hostile manner and in a manner which a reasonable person would find objectively unreasonable.  The district court explained that it declined to adopt the report and recommendation to the extent that it adopted the Brooks/Christian standard for a *prima facie* case, and the court recommitted the summary judgment motions to the undersigned.  The district court instructed the undersigned to apply the *prima facie* standard of Benton v. Cousins Properties, Inc., 230 F. Supp. 2d 1351 (N.D. Ga. 2002), aff'd, 97 Fed. Appx. 904 (11th Cir. 2004), which requires a plaintiff to show that the defendant treated the plaintiff less favorably with regard to the allegedly discriminatory act than the defendant treated other similarly situated persons who were outside the plaintiff's protected class.  The undersigned, therefore, submits the following report and recommendation in accordance with the district court's instructions.

3

## I.    Facts

The court notes at the outset that both Plaintiffs and Defendants have made it extremely difficult to determine the relevant facts in this case.  As Defendants note, this court specifically instructed the parties that "every factual statement made in the parties' briefs should be followed by a citation to the record" and that "[t]hese citations should include specific page or paragraph numbers, where appropriate."  [1:08-CV-2514, Doc. 105 at 3; 1:08-CV-2554, Doc. 93 at 3].   Despite these instructions, Plaintiffs often fail to point to specific evidence in support of their arguments.  Defendants also correctly note that more than once Plaintiffs "piece together snippets of unrelated testimony to try to manufacture a record that does not exist."  [Doc. 116 at 3].  Plaintiffs also frequently present string cites that simply do not support the allegations made in the briefs.  In addition, the versions of facts presented by both Plaintiffs and Defendants often are not supported by the cited evidence.  The court will do its best to decipher the parties' assertions and arguments; however, "[i]t should be a party's responsibility to direct the Court's attention separately to each portion of the record which supports each of the party's distinct arguments."  Dickson v. Amoco Performance Products, Inc., 845 F. Supp. 1565, 1570 (N.D. Ga. 1994).  See also United States v. Adkinson, 135 F.3d 1363, 1378-80 (11th Cir. 1998); Johnson v. City

4

of Ft. Lauderdale, Florida, 126 F.3d 1372, 1373 (11th Cir. 1997); Bozeman v. Per-Se

Technologies, Inc., 456 F. Supp. 2d 1282, 1292 n.13 (N.D. Ga. 2006).

When evaluating the merits of a motion for summary judgment, the court must

"view the evidence and all factual inferences raised by it in the light most favorable to

the non-moving party, and resolve all reasonable doubts about the facts in favor of the

non-moving party." Comer v. City of Palm Bay, Florida, 265 F.3d 1186, 1192 (11th

Cir. 2001). However, mere conclusions and unsupported self-serving statements by

the party opposing summary judgment are insufficient to avoid summary judgment.

See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). Therefore, the evidence

presented by the parties having been evaluated in accordance with the foregoing

principles, the following facts are deemed to be true for the limited purpose of

evaluating Defendants' motions [1:08-CV-2514, Doc. 112; 1:08-CV-2554, Doc. 100]

for summary judgment.

On August 11, 2006, Plaintiffs Joseph Shaw and Joe Barry Carroll visited the

Tavern at Phipps at approximately 6:00 p.m. [Plaintiff Shaw's Statement of Material

Facts ("SSMF") ¶ 22; Plaintiff Carroll's Statement of Material Facts ("CSMF") ¶ 21].

Plaintiffs sat next to each other at the end of the bar near the patio entrance and ordered

drinks and appetizers. [Defendant's Statement of Material Facts in Carroll Case

5

("DSMFC") ¶ 4; Defendant's Statement of Material Facts in Shaw Case ("DSMFS") ¶ 4]. The bar area was "thin" when Plaintiffs arrived at the Tavern, but it soon became crowded and noisy. [DSMFC ¶ 3; DSMFS ¶ 3; Carroll Deposition ("Dep.") at 63-64]. At the time they entered the Tavern and throughout the relevant time period that evening, Carroll and Shaw were the only African-Americans sitting at the bar. [SSMF ¶ 23; CSMF ¶ 22].

The Tavern at Phipps has an unwritten practice of asking male customers sitting at the bar to give up their seats to female customers standing and waiting for a seat. [DSMFC ¶ 1; DSMFS ¶ 1]. Sheena Norris, a former hostess and office manager at the Tavern, testified that this practice was referred to as "southern hospitality." [Norris Dep. at 29, 142]. The Tavern's bar seating policy involved stages. First, the bartender was supposed to ask the male customers to move for the female customers. Second, the bartender was to offer the customer drinks to move. Third, if the customer still refused, the bartender was to contact management. Fourth, management then was to make attempts to get the customer to move. And fifth, if the customer still refused to move, management and staff were to refuse service. [SSMF ¶ 13; CSMF ¶ 13]. The seating policy stages, however, were not rigidly applied. For example, at certain times, only management was allowed to give complimentary food or drinks for men at the

6

bar.  [Kelly Dep. at 107; Arocha Dep. at 28].  It was normal practice not to ask any customer to move at all if there were already open seats.  [SSMF ¶ 14; CSMF ¶ 14]. It was normal practice not to ask customers to move if they were mid-service, that is, if they were still eating or waiting for ordered food.  [SSMF ¶ 15; CSMF ¶ 15; Angulo Dep. at 95; Greenbaum Dep. at 61].

As Plaintiffs Carroll and Shaw were in the process of finishing their appetizers, two white women walked up behind them and were waiting for seats at the bar. [DSMFC ¶ 5; DSMFS ¶ 5; Carroll Dep. at 55, 63].  Thereafter, one of the Tavern's bartenders, Patrick Kelly, approached Plaintiffs and asked them to relinquish their seats to the two white women, but Plaintiffs declined.  [SSMF ¶ 24; CSMF ¶ 23].  At the time, they were not finished with their drinks but they had finished their appetizers. [SSMF ¶ 25; CSMF ¶ 24; Carroll Dep. at 49-50; Shaw Dep. at 76].  Kelly indicated that it was the custom and practice for men to give up their seats to women at the Tavern's bar, and he asked the men a second time to give up their seats.  [SSMF ¶ 26; CSMF ¶ 25].  Plaintiff Carroll testified:

> My recollection is that I looked to the end of the bar. . . .  And there was a white man, and there was an empty seat–there were empty seats besides [sic] him and there was a guy standing by a seat.  So there were seats down there, because I remember saying to them as this thing was whipped into a crazy lather that there are seats down–There's a guy down

there.  Why don't you ask him for his seat?  And they told us, They don't want those seats.  They want your seats.

[Carroll Dep. at 76].  Plaintiff Shaw testified that there was a white male at the bar and two empty seats beside him.  [Shaw Dep. at 82-83].  Kelly asked whether Plaintiffs would be willing to give up their seats to the ladies standing behind them in exchange for a free round of drinks.  [DSMFC ¶ 6; DSMFS ¶ 6; Carroll Dep. at 49-50, 95; Shaw Dep. at 60-61, 79; Kelly Dep. at 75-76].  When Carroll and Shaw declined to give up their seats, Kelly left rolling his eyes and looking annoyed, and Carroll and Shaw continued their conversation.  [SSMF ¶ 27; CSMF ¶ 26; DSMFC ¶ 7; DSMFS ¶ 7; Carroll Dep. at 49-50; Shaw Dep. at 76].

At the time Kelly asked Carroll and Shaw to vacate their seats, the Tavern's owner Greg Greenbaum was sitting in a booth behind the bar and looking at the bartenders, and they felt pressure to adhere to the Tavern's policies while Greenbaum was there.  [SSMF ¶ 29; CSMF ¶ 28; Kelly Dep. at 108-09].  After Carroll and Shaw declined to vacate their seats, Greenbaum approached Kelly almost "immediately."  Kelly then explained to Greenbaum that Carroll and Shaw had declined to give up their seats.  [SSMF ¶ 30; CSMF ¶ 29].  Greenbaum said, "Are you going to get these girls in these seats?"  [Kelly Dep. 76-79; SSMF ¶ 31; CSMF ¶ 30].  Kelly later told

8

operating partner Heather Dennis, "I offered to buy the gentlemen a round, and they said no, and that immediately I–Greg, you know, pointed at these ladies, and I immediately told Greg that they declined." [Kelly Dep. at 82; SSMF ¶ 32; CSMF ¶ 31].

Heather Dennis and manager Rick Russell then spoke to Carroll and Shaw. Dennis and Russell identified their titles as operating partner and manager, respectively, and both stated that it was the practice at the Tavern for male customers to relinquish their seats to female customers. Dennis then asked Carroll and Shaw to vacate their seats. [SSMF ¶ 33; CSMF ¶ 32; DSMFC ¶ 9; DSMFS ¶ 9]. Carroll and Shaw again declined and responded to Dennis that they were not ready to leave. [SSMF ¶ 34; CSMF ¶ 33]. Shaw stated that Dennis then left, and Russell began speaking to Shaw and Carroll. Shaw testified:

> And Mr. Russell, he says, Hey, don't you guys want to be Southern gentlemen and give up your seat? And we say, No. And then we get into a conversation with Mr. Russell. And we say, Well, you know, there's another male sitting at the other end of the bar; why isn't he being asked to give up his seat? And Mr. Russell says, Well, they want your seats, you know, so don't worry about that.

[Shaw Dep. at 89]. According to Shaw, he also said to Russell:

> So what's the problem here? You know, we are the only African-American people at the bar and . . . you're bugging us about two seats;

9

what's the problem? . . .   And, you know, given the history of this country, with people sitting at bars and student sit-ins, and all this type of stuff, so people can sit at counters, why are you bugging us about some bar?  What's the problem?  You know, it seems awful–it seems like you're making an awful big deal out of two bar seats.[1]

[Shaw Dep. at 111-12].   Around this point, a bartender named Devin Frett, who is African-American, approached Carroll and Shaw and said that asking them to give up their seats was "not a racial thing," but "something that we do all the time."  [Frett Dep. at 52, 53, 55-57; Shaw Dep. at 100-01; SSMF ¶ 38; CSMF ¶ 37].

Another bartender named Ramon Arocha testified that while Plaintiffs were being asked to give up their seats, there were only two other men seated at the bar–a white man and an Indian man.  These men were at the end of the bar opposite of where Plaintiffs were sitting.  [Arocha Dep. at 38-42, 84-86].  Arocha testified that the white man and the Indian man were not sitting in adjacent seats; instead, there was a woman sitting in the seat between them.  [Arocha Dep. at 84-86].  According to Arocha, he was working the opposite end of the bar from where Plaintiffs were sitting, and Kelly approached him and told him that "we have two gentlemens [sic] here who don't want to give up the seat."  [Arocha Dep. at 38-41, 43].  Arocha stated that he saw the other

---

[1]At this point in the deposition, Shaw allegedly told Russell that "you've got 20 seats," but he later clarified that he was not suggesting that there were 20 open seats at the bar.  [Shaw Dep. at 112, 136-37].

10

Tavern employees asking Plaintiffs to give up their seats. [Arocha Dep. at 43-45]. He then realized that he had two men sitting at his end of the bar. [Arocha Dep. at 41-42, 84-86]. Arocha asked the women who were standing at the bar if they wanted the seats occupied by these two men, and he then asked the men to give up their seats for the two women. [Arocha Dep. at 41-42, 84-86]. Both the white man and the Indian man gave up their seats, and the two women sat down in those seats. [Arocha Dep. at 41-42].

Operating partner Heather Dennis was not sympathetic with Plaintiffs Carroll and Shaw, and while the incident was occurring, she became increasingly more irritated. [SSMF ¶ 39; CSMF ¶ 38]. Dennis began speaking loudly and indicated repeatedly that, if Carroll and Shaw did not relinquish their seats, they would have to leave the restaurant and that she would call the police if they did not leave. [Carroll Dep. at 96-97; SSMF ¶ 40; CSMF ¶ 39; DSMFC ¶¶ 11, 15; DSMFS ¶ 13]. Dennis was asked and testified to the following:

> Q.   Did you indicate to [Carroll and Shaw] that if they did not relinquish their seats or give up their seats, you would have them removed?
> A.   Yes.
> Q.   Can you tell me a little bit more about what you said or what language you might have used?
> A.   I probably said "removed."

11

> Q.   Did you indicate that you would call the police to remove them?
> A.   No.  That was their suggestion.
> Q.   Okay.  So they suggested you should call the police?
> A.   They were not leaving of their own free will.
> Q.   Okay.  But you said if they did not give up their seats, you would have them remove[d]?
> A.   I would ask them to leave.
> Q.   Did you say, "ask them to leave," or have them removed?
> A.   I have no idea.
> Q.   But something to that effect?
> A.   Sure.

[Dennis Dep. at 28-29].

Plaintiffs refused to leave and urged Dennis to call the police.  [DSMFC ¶ 16; DSMFS ¶ 14; Carroll Dep. at 96-97].  Plaintiff Carroll testified that he told Dennis, "Yes, you should call the police. . . .  Because we needed this to be–I needed some record of this.  I needed somebody, a third party to come in here and witness what was happening."  [Carroll Dep. at 97].  Dennis then called Nehemiah Sanders, a City of Atlanta police officer who provides off-duty security for the Tavern.  [DSMFC ¶ 17; DSMFS ¶ 15].  Officer Sanders was scheduled to provide security at the Tavern starting less than an hour later that evening, and he arrived within fifteen minutes of being called by Dennis.  [SSMF ¶ 43; CSMF ¶ 42; Dennis Dep. at 46].  Prior to this incident, Officer Sanders had never been called to the Tavern in connection with

patrons not being willing to give up their seats at the bar.[2]  [SSMF ¶¶ 44, 45; CSMF

¶¶ 43, 44].  Officer Sanders had on his uniform, badge, and gun, and he walked over

to Plaintiffs and explained that it was the practice of the Tavern to ask male customers

sitting at the bar to give up their seats to female customers standing and waiting for a

seat.  [SSMF ¶ 46; CSMF ¶ 45; DSMFC ¶ 19; DSMFS ¶ 17].

Shortly after this conversation, Officer Sanders escorted Plaintiffs Carroll and

Shaw out of the Tavern.  [DSMFC ¶ 21; DSMFS ¶ 18; Carroll Dep. at 118-19; Shaw

Dep. at 106-07].  Plaintiffs were not disorderly or disruptive in any way, and Officer

Sanders was professional in dealing with them.  [SSMF ¶¶ 47, 48; CSMF ¶¶ 46, 47;

DSMFC ¶ 20; Carroll Dep. at 113].  The whole incident lasted no more than twenty to

thirty minutes.  [DSMFC ¶ 22; DSMFS ¶ 19].  At no time during the incident did

anyone associated with the Tavern use any profanity or any racial epithets or slurs.

[DSMFC ¶ 23; DSMFS ¶ 20; Carroll Dep. at 105].

Plaintiffs immediately went to the bar at the Ritz-Carlton in Buckhead after

leaving the Tavern that evening.  They spent a couple of hours there, but they did not

---

[2]However, on at least one other occasion in April 2008, a white man adamantly refused to give up his seat at the bar for a woman.  At that time, the manager on duty had to summon mall security to help remove the male customer from the Tavern. [DSMFC ¶ 18; DSMFS ¶ 16; Angulo Dep. at 46-47, 99].

order any food.  [DSMFC ¶ 25; DSMFS ¶ 21].  Carroll and Shaw have not been back to the Tavern since the incident.  [DSMFC ¶ 26; DSMFS ¶ 22].

Plaintiffs seek to introduce testimony which allegedly establishes that owner Greg Greenbaum and members of management at the Tavern were racially biased against African-American customers.  Defendants object to this testimony and argue that it is inadmissible for a number of reasons.  [1:08-CV-2554, Doc. 116 at 5-13].[3] According to Defendants, "Plaintiffs rely heavily on the testimony of a handful of disgruntled former employees at The Tavern who opine, without any personal knowledge, that Greenbaum is prejudiced against African-American customers or speculate that certain practices or activities there were race-based."  [Doc. 116 at 5-6]. Defendants also contend that alleged instances of racial discrimination are inadmissible because they are unrelated either to the practice of asking men to relinquish their seats or to the incident involving Plaintiffs.  [Doc. 116 at 8-12].  Defendants specifically point to theme changes in the bar, the type of drinks served and eliminated, and the hiring and scheduling of black cocktail waitresses, hostesses, and bartenders.  [Doc. 116 at 8-12].  Many of Defendant's arguments on these issues are persuasive.

---

[3]The same reply brief was filed in the companion case.  [1:08-CV-2514, Doc. 131].

14

The Tavern employees involved in asking Plaintiffs Carroll and Shaw to relinquish their seats were bartender Patrick Kelly, operating partner Heather Dennis, bartender Devin Frett, owner Greg Greenbaum, and manager Rick Russell.  Dennis was the employee who made the decision to call security and have Plaintiffs escorted out of the Tavern.  [SSMF ¶¶ 24, 26, 29-34, 38-40; CSMF ¶¶ 23, 25, 28-33, 37-39; DSMFC ¶¶ 9, 11, 15-17; DSMFS ¶¶ 9, 13-15; Kelly Dep. at 82; Shaw Dep. at 89, 100-01, 111-12; Frett Dep. at 52, 53, 55-57; Carroll Dep. at 96-98; Dennis Dep. at 28-29].  Any admissible evidence that these employees were motivated by racial animus is relevant to Plaintiffs' claims of racial discrimination in a place of public accommodation.  Also relevant is any admissible evidence that the Tavern's practice of asking men to relinquish their seats to women was applied in a racially discriminatory manner.

Much of the deposition testimony offered by Plaintiffs comes in the form of subjective opinions offered by former employees regarding Greenbaum's alleged racial animus against African-Americans in operating the Tavern.  Plaintiffs cite, for example, the testimony of a former employee named Michael Murphy who stated that he "believe[s] that [Greenbaum] is prejudice against African-Americans."  [Murphy Dep. at 120; SSMF ¶ 2; CSMF ¶ 2].  Pursuant to Federal Rule of Evidence 701,

AO 72A

(Rev.8/82)

opinion or inference testimony from lay witnesses is admissible only if it is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge with the scope of Rule 702." Fed. R. Evid. 701.

Murphy's opinion that Greenbaum was racially biased against African-Americans was not based on any statements or remarks made by Greenbaum. [Murphy Dep. at 120, 133].  Instead, Murphy's opinion was based on theme changes and drink selections made by Greenbaum in running the bar.  [Id.].  Greenbaum had a Country Music Awards banner placed in the bar, removed Red Stripe and Heineken  from the list of beers served, and removed the blender that made frozen drinks.  [Id.].  Murphy testified that he believed that these actions taken by Greenbaum revealed racially discriminatory animus.  [Id.].  The court disagrees and finds Murphy's opinion evidence inadmissible.

While it is possible that Greenbaum's decisions with respect to theme changes in the bar and the selection or elimination of drinks were motivated by racial animus, the court finds that this evidence is not sufficient to establish that Murphy's opinion was "rationally based on the perception of the witness," as required by Rule 701.

16

Greenbaum obviously could have been motivated by race-neutral factors in making all of these decisions.  See Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341, 347 (1st Cir. 1995) ("Although these observations may be entirely compatible with a race-based animus, there simply is no foundation for an inference that Domina harbored a racial animus toward Alexis or anyone else, absent some probative evidence that Domina's petulance stemmed from something other than a race-neutral reaction to the stressful encounter plainly evidenced in the summary judgment record, including Alexis's persistence (however justified).").  As the Second Circuit has written:

> Witnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or with other employees, but "the witness's opinion as to the defendant's [ultimate motivations] will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to whether or not the defendant" was motivated by an impermissible animus.

Hester v. BIC Corp., 225 F.3d 178, 185 (2nd Cir. 2000) (quoting United States v. Rea, 958 F.2d 1206, 1216 (2nd Cir. 1992)).  Similarly, in the present case, employees may testify about their own observations of how African-American customers were treated at the Tavern, but their opinion testimony which amounts to speculation is not admissible.

17

Defendants next object to the declaration and testimony of Sheena Norris, a former employee of the Tavern, who stated that management instructed her to first ask African-American men to vacate their seats at the bar before asking Caucasian men. [1:08-CV-2554, Doc. 116 at 12-13; Norris Dep. at 35, 46-48; 1:08-CV-2514, Doc. 119, Ex. B, Norris Declaration ("Dec.") ¶¶ 3-9].  Defendants object to this statement because Norris only identified in her declaration that this instruction came from unnamed "management."  [Doc. 116 at 13; Norris Dec. ¶¶ 3-7].  The court finds that Defendants are correct on this issue and that Norris' testimony about alleged instructions made by unnamed "management" is not admissible.  See Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1457 (11th Cir. 1997) (finding that hearsay testimony referring to statements made by un-identified "they," supposedly management, as to the policy of the defendant inadmissible)[4]; Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1002 (3rd Cir. 1988) (same).  Defendants also point out that Norris acknowledged at her deposition that she never heard owner Greg Greenbaum, operating partner Heather Dennis, or any other Tavern employee who was involved in

---

[4]Inadmissible hearsay is "an out-of-court statement, presented for the purpose of establishing the truth of the statement's contents, that does not fall within an exception to the hearsay rule."  Macuba v. DeBoer, 193 F.3d 1316, 1322 n.11 (11th Cir. 1999).

18

the incident with Plaintiffs state that the unwritten rule at the Tavern was that African-American men were to be asked to vacate their seats at the bar before Caucasian men were to be asked.  [Doc. 116 at 13; Norris Dep. at 59].  Defendants are correct on this issue as well.  Norris' testimony about an alleged instruction by others who were not involved with the incident with Plaintiffs is not admissible.

Other testimony offered by Norris, however, is admissible because it amounts to her own observations which are relevant to Plaintiffs' claims.  Norris testified that on one occasion in 2005 or 2006, she was instructed by Heather Dennis to ask two African-American men to give up their seats at the bar despite the fact that they were not finished eating.  [Norris Dep. at 46-50].  Norris testified to the following:

A.   As long as I was asking somebody who was close to being finished, or was just sitting there talking, or getting ready to pay a bill, that was fine. . . .  [I]f you're just sitting there drinking, and you've already paid your tab, you know, it would be okay to ask them to move, because they are pretty much finished. . . .

Q.   Well, what happened that you thought was a problem?

A.   Well, what happened that I thought was a problem was that there were other people that were finished, and because an African-American [was] sitting there, that's the person that I had to ask first.

Q.   Who told you to ask the African-American?

A.   Heather Dennis.

Q.   And what did Heather Dennis say to you?

A.   When I went and I told her that people are pretty much eating or whatever, she said, Well, there's two men . . . sitting right there,

> two African-American men.  I told her who they suggested, the
> bartenders, who they suggested to move.  And she told me no.
> And she told me who to ask.  And that's . . . who I had to ask.
>
> Q.     And she said, Ask the two African-American men?
> A.     Yes, she did.

[Norris Dep. at 46-48].

Norris also testified that Heather Dennis told her that the desired clientele for the bar area was "white businessmen and well-endowed women, usually having blonde hair, big boobs, that type of thing."  [Norris Dep. at 126].  The court finds that this alleged statement is admissible and not hearsay because it is a party opponent admission under Federal Rule of Evidence 801(d)(2)(D).  This Rule provides that an admission by a party opponent is not hearsay if the "statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D).  "This rule requires that the declarant be both authorized and acting within the scope of employment, when making an admission on behalf of the defendant." Bhaya v. Westinghouse Elec. Corp., 922 F.2d 184, 194 (3rd Cir. 1990) (Mansmann, dissenting); accord Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005) (same).

20

As an operating partner, Dennis was a member of the Tavern's management and acting within the scope of her employment as a manager when she allegedly told Norris that the clientele the Tavern was trying to draw was "white businessmen and well-endowed women, usually having blonde hair, big boobs, that type of thing." [Norris Dep. at 126].   Dennis' alleged statement to Norris was "made during the existence of the [employment] relationship[,]" as required by Rule 801(d)(2)(D).  See Zaken v. Boerer, 964 F.2d 1319, 1323 (2nd Cir. 1992) (The court held that a statement describing discriminatory motive made by a former member of defendant's management to a fellow employee was admissible under Rule 801(d)(2)(D) because it "was made during the course of [the declarant's] employment as vice president of sales," and the fact *inter alia* that the declarant "later left the company . . . would go to the weight of the evidence, not its admissibility.").   Norris' account of Dennis' statement is particularly significant given the fact that Dennis was the employee who was involved in the confrontation with Plaintiffs Carroll and Shaw and who called security to have Plaintiffs escorted out of the Tavern.  See Rowell, 433 F.3d at 800 ("courts have admitted statements of managers under Rule 801(d)(2)(D) where there is some kind of participation in the employment decision or policy of the employer"); Abrams v. Lightolier Inc., 50 F.3d 1204, 1216 (3rd Cir. 1995) ("Where a supervisor is

21

authorized to speak with subordinates about the employer's employment practices, a subordinate's account of an explanation of the supervisor's understanding regarding the criteria utilized by management in making decisions on hiring, firing, compensation, and the like is admissible against the employer.").  For these reasons, the undersigned finds that Norris' testimony of Dennis' statement regarding the desired clientele of the Tavern bar is admissible under Rule 801(d)(2)(D) as a party opponent admission.   Therefore, it will be considered in evaluating Defendants' summary judgment motions.

The court turns next to the admissibility of the testimony of Dennis, who was asked and testified to the following:

> Q.  Did you have discussions, ma'am, about the fact that management wanted to keep the bar-patio area as white as it possibly could?
> A.  I don't think those were the words that were used.
> Q.  Tell me what words were used.
> A.  I think they wanted to keep it generally white, yes.
> Q.  Tell me what you mean by they wanted "to keep it generally white."
> A.  Generally white; more white people.
> Q.  Management wanted more white patrons in the bar-patio area than they did black patrons, didn't they, ma'am?
> A.  Correct.
> Q.  And you knew that, didn't you?
> A.  Correct.

22

[Dennis Dep. at 172-73].  The substance of this testimony is not clear, and the parties did not address its admissibility in their summary judgment briefs.  While Dennis did agree that she believed that "[m]anagement wanted more white patrons in the bar-patio area than they did black patrons," she did not specify with whom she had discussions about this subject as alluded to in the first part of the quoted testimony.  See Zaben, 129 F.3d at 1457; Carden, 850 F.2d at 1002.  The only people identified by Dennis are unnamed members of management.  In its initial report and recommendation, the undersigned found that this testimony constituted an admission by a party opponent under Rule 801(d)(2)(D).  However, the court now concludes that this testimony is inadmissible because, in addition to failing to identify "management," unlike Dennis' alleged statement to Norris, at the time Dennis made these statements during her deposition, she was not working at the Tavern.  Because Dennis' statements were not "made during the existence of the [employment] relationship[,]" they are not admissible against Defendants under Rule 801(d)(2)(D).

The court turns next to evidence regarding the hiring practice of cocktail waitresses and hostesses.  Defendants contend that evidence regarding the hiring of these employees should not be considered by the court because it is unrelated either to the incident at issue or to the practice of asking men to give up their seats for

23

women. [Doc. 116 at 8-9]. The court agrees. Plaintiffs cite to the deposition testimony of Chris Pappas, a former operating partner at the Tavern. [1:08-CV-2554, Doc. 108 at 6-8; Pappas Dep. at 35-36, 52]. Pappas worked at the Tavern as an operating partner from December 2002 to January 2005. [Pappas Dep. at 31-32, 34-36, 52]. Pappas testified that he was once reprimanded by Dan Angell, a Vice President of Defendant CentraArchy, for having two black hostesses on the same night shift. [Doc. 108 at 6-8; Pappas Dep. at 92, 94]. Pappas also testified that on one occasion, he and Greg Greenbaum, the Tavern's owner, "talked about clientele in the bar and how black females will attract black males which could deter some of the current clientele that we have in there." [Doc. 108 at 6-8; Pappas Dep. at 97-98]. According to Pappas, Greenbaum said that "if we have black females in the bar . . . then black thugs . . . are sure to follow . . . and that will kill his business like it did the Buckhead Village." [Doc. 108 at 6-8; Pappas Dep. at 114].

Heather Dennis testified that she was told by both Chris Pappas and Meredith McCabe, Director of Operations for Defendant CentraArchy, that she was "not supposed to have two black hostesses to work at the same time on a shift on Friday and Saturday nights." [Doc. 108 at 6-8; Dennis Dep. at 154, 161; McCabe Dep. at 24]. Dennis also testified that from the time she first worked at the Tavern in 2003 until

24

January 2005, "there was a practice at The Tavern that prohibited black cocktail waitresses from being hired." [Dennis Dep. at 163].

The court finds that the above-cited testimony from Pappas and Dennis is inadmissible and will not be considered in evaluating Defendants' summary judgment motions. With regard to Pappas' testimony, it is confusing and unclear, not relevant to Plaintiffs' claims, and unduly prejudicial. As noted *supra*, Pappas testified that he was once reprimanded by Vice President Dan Angell for having two black hostesses on the same night shift. [Pappas Dep. at 92]. But when asked about this incident, Pappas testified that it was not Angell who said anything about perceived negative results of having two black hostesses working at the same time. [Pappas Dep. at 93]. Instead, Pappas testified that he was the one who stated to Angell that "there's a philosophy that if we have two black hostesses here then we're going to have black thugs that are sure to follow which will run off our current clientele in the bar business." [Pappas Dep. at 93]. Angell, who apparently did not know anything about this "philosophy," then asked Pappas, "[S]o what's that mean?" [Id.]. Pappas then told Angell that the Tavern "probably shouldn't have two black hostesses working together at the same time." [Id.]. When Pappas was asked at his deposition where he learned of the "philosophy" that two black hostesses should not work together, he

25

stated, "I'm not sure.  Other people in the industry working in Atlanta.  Knowledge of what the clientele [were] in the Buckhead Village."  [Pappas Dep. at 96].  The court finds that Pappas' testimony regarding his conversation with Angell and the "philosophy" of not having two black hostesses work together does more to show that Pappas, not Angell, was the one who held a discriminatory motive.  Pappas was not even employed by the Tavern at the time of the incident with Plaintiffs Carroll and Shaw.   Accordingly, the court concludes that this testimony is not germane to Plaintiffs' claims of racial discrimination.

As noted *supra*, Pappas also testified that on one occasion, Greenbaum said that "if we have black females in the bar . . . then black thugs . . . are sure to follow . . . and that will kill his business like it did the Buckhead Village."  [Pappas Dep. at 114].  When asked about this, however, Pappas was not sure if Greenbaum actually used the word "thugs."  [Pappas Dep. at 98, 114-15].  Pappas was also asked and testified to the following:

> Q.    He used those words "kill his business"?
> A.    I – it's not verbatim, no.
> Q.    Well, what do you remember him actually saying?
> A.    I don't.  It's a paraphrase.

26

[Pappas Dep. at 115-16].  In addition to this confusion regarding Pappas' testimony, when he was asked what Greenbaum said to him on that occasion, Pappas responded by saying, "*We* talked about clientele in the bar and how black females will attract black males which could deter some of the current clientele that we have in there." [Pappas Dep. at 97-98 (emphasis added)].  Thus, it is not even clear from Pappas' testimony if Greenbaum was the one who was talking about "how black females will attract black males" or, as was the case with Angell, if Pappas was the one describing this "philosophy." [Id.].  Moreover, when asked if he ever got this "philosophy" from Greenbaum, Pappas testified, "No."  [Pappas Dep. at 96].  Pappas also testified that Greenbaum never instructed him that he could not have two black hostesses working at the same time.  [Pappas Dep. at 95].

Not only is Pappas' testimony of this single conversation with Greenbaum confusing, Pappas stated that the conversation occurred many years before the incident involving Plaintiffs Carroll and Shaw.  Pappas testified that his conversation with Greenbaum occurred "right after [he] became the operating partner" in December 2002, while his employment ended in January 2005. [Pappas Dep. at 31-32, 34-36, 52, 97].  This means that Pappas' conversation with Greenbaum occurred more than three and a half years before the August 2006 incident involving Plaintiffs Carroll and

27

Shaw.[5]  [Id.; SSMF ¶ 22; CSMF ¶ 21].  In employment discrimination cases, courts have held that "the more remote and oblique the [allegedly discriminatory] remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2nd Cir. 2007).  The same principle applies in the present case because employment discrimination claims are evaluated using the same standards and burden-shifting scheme as claims of discriminatory public accommodation. Solomon v. Waffle House, Inc., 365 F. Supp. 2d 1312, 1321 (N.D. Ga. 2004).  Given the confusing nature of Pappas' testimony and the fact that this one alleged conversation with Greenbaum occurred years before the incident at the Tavern involving Plaintiffs, the court finds that Pappas' testimony is not relevant to Plaintiffs' claims and is unduly prejudicial. It is, therefore, inadmissible and will not be considered by the court in evaluating Defendants' summary judgment motions.

With regard to Dennis' testimony, as described *supra*, she testified that she was told by both Chris Pappas and Meredith McCabe that she was "not supposed to have two black hostesses to work at the same time on a shift on Friday and Saturday nights."

---

[5]Pappas had not even worked at the Tavern for more than a year and a half before the incident with Plaintiffs.  [Pappas Dep. at 31-32, 34-36, 52; SSMF ¶ 22; CSMF ¶ 21].

28

[Doc. 108 at 6-8; Dennis Dep. at 154, 161].  Dennis also testified that from the time she first worked at the Tavern in 2003 until she became an operating partner in January 2005, "there was a practice at The Tavern that prohibited black cocktail waitresses from being hired." [Dennis Dep. at 163].  This testimony will not be considered by the court for a number of reasons.

The alleged instruction from Pappas and McCabe to Dennis that she was "not supposed to have two black hostesses to work at the same time on a shift on Friday and Saturday nights" is not relevant to Plaintiffs' claims because it only reveals alleged racially discriminatory intent on the part of Pappas and McCabe.  [Doc. 108 at 6-8; Dennis Dep. at 154, 161].  Neither Pappas nor McCabe was involved in the incident with Plaintiffs Carroll and Shaw.  Moreover, Dennis testified that she never had any discussion about the policy with Greenbaum, the owner of the Tavern, who was present at the time of the incident at issue.  [Dennis Dep. at 161].  With regard to Dennis' testimony that the Tavern had a practice "that prohibited black cocktail waitresses from being hired," Dennis stated that this alleged practice was in place when she came to work at the Tavern in 2003 until she became an operating partner in January 2005.  [Dennis Dep. at 163].  Dennis, however, hired two black cocktail waitresses in the spring of 2005.  [Dennis Dep. at 162-63].  Given the fact that the

29

incident involving Plaintiffs occurred in August 2006, the court finds that Dennis'

statement on this issue is not relevant to Plaintiffs' claims.

The statements from Dennis regarding the scheduling of black hostesses and the

hiring of black cocktail waitresses, as well as any allegations regarding the hiring and

scheduling of bartenders, are also not admissible because they involve employment

practices of the Tavern.  Alleged discrimination in personnel actions are not relevant

to Plaintiffs' claims of customer mistreatment on the basis of race.  In Jackson v.

Waffle House, Inc., 413 F. Supp. 2d 1338 (N.D. Ga. 2006), the plaintiffs were

customers who brought claims of racial discrimination in public accommodations

against the defendant restaurant.  The court held that the affidavits of six former

employees were inadmissible because they did "not allege any wrongdoing against any

customer at any of the four Waffle House units at issue in this lawsuit" and that four

of the affidavits "merely allege[d] discriminatory hiring practices. . . ." Id. at 1345-46.

As the court noted, "Waffle House's hiring practices are not the issue of this case."

Id. at 1346.  In the present case, because the scheduling and hiring practices of the

Tavern do not allege wrongdoing against customers, they will not be considered by the

court.

30

Defendants also object to testimony cited by Plaintiffs that on one occasion, Heather Dennis instructed bartenders to slow serve black patrons at the bar. [1:08-CV-2554, Doc. 116 at 12; 1:08-CV-2514, Doc. 132 at 15]. Michael Murphy, a bartender who worked at the Tavern in 2005 and 2006, testified that this instruction was made by Dennis once during a pre-shift meeting. [Murphy Dep. at 94-96]. According to Murphy, Dennis told the bartenders that if they "saw a black patron or group of them standing at the bar waiting for drinks," then the bartenders were to "let them wait as long as possible" before serving them. [Id.]. Murphy stated that this incident occurred in late 2005 or early 2006. [Murphy Dep. at 95]. Heather Dennis was asked and testified to the following:

> Q. Do you recall ever telling any of your bartenders that if they saw black patrons waiting at the bar in The Tavern that they were to let those patrons wait as long as they possibly could before serving them?
> A. There was only one incident where that happened. . . . [Greg Greenbaum] told me to tell the bartenders to make the two people standing at the end to wait for a long–for a period of time before being served. . . .
> Q. What was the race of those patrons?
> A. They were black.
> Q. They were black males?
> A. No, they were females.

[Dennis Dep. at 192-93].

31

The statements from Murphy and Dennis make specific allegations of racially motivated wrongdoing against African-American customers of the Tavern. The account of Dennis' instructions to bartenders to slow serve black patrons at the bar is not hearsay because it is not "presented for the purpose of establishing the truth of the statement's contents," but to show that Dennis actually issued the instruction. Macuba, 193 F.3d at 1322 n.11. "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay." United States v. Bellomo, 176 F.3d 580, 586 (2nd Cir. 1999) (citing United States v. Stratton, 779 F.2d 820, 830 (2nd Cir. 1985)). Even if the accounts of Dennis' instructions to Tavern bartenders were hearsay, they would be admissible under Rule 801(d)(2)(D) as a party opponent admission. The statements are obviously relevant to Plaintiffs' claims because Dennis was the member of management who made the decision to call security and remove Plaintiffs from the Tavern. In addition, Murphy testified that Dennis gave the instruction to slow serve black patrons in late 2005 or early 2006, a time near the August 2006 incident involving Plaintiffs Carroll and Shaw. For these reasons, the court will consider this testimony in evaluating Defendants' summary judgment motions.

32

## II.     Plaintiff's Supplemental Discovery Materials

On May 6, 2010, Plaintiff Carroll filed supplementary discovery materials in opposition to Defendants' summary judgment motions.  [1:08-CV-2514, Doc. 147]. These materials consisted of a number of unauthenticated emails and the declaration of Frederick McCall with an attached email.  [Id.].  Plaintiff Carroll filed a second set of supplementary discovery materials on June 27, 2010, after this court had issued its initial report and recommendation.  [1:08-CV-2514, Doc. 151].   These materials consisted of an unauthenticated email from Jay Kulkin and the declarations of Marcus Collier and Rodney Odom with an attached email.  [Id.].  In response, Defendants filed a motion to strike both of Plaintiff's supplementary discovery filings.  [1:08-CV-2514, Doc. 154].  Plaintiff Carroll then filed a motion for an extension of time to file the supplemental discovery materials previously submitted and a motion to allow the late-filed evidence.  [1:08-CV-2514, Docs. 155, 157].

Defendants argue in their motion to strike that the supplemental discovery materials are untimely because they were submitted after the close of discovery.  [Doc. 154].  However, the evidence establishes that Plaintiffs' counsel was completely unaware of these witnesses until the spring of 2010 after discovery closed.  The witnesses state that they saw media coverage concerning this case and contacted

AO 72A

(Rev.8/82)

Plaintiffs' counsel. [1:08-CV-2514, Doc. 147, Ex. B ("McCall Dec."); Doc. 151, Exs. A ("Collier Dec."), B ("Odom Dec.")].  In light of these facts, the court will not disregard this evidence on the basis of untimeliness.  Much of the late-filed evidence, however, is inadmissible.

Federal Rule of Civil Procedure 56(c)(4) (amended 2010) provides, "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  "To be admissible, documents must be authenticated by and attached to an affidavit [or declaration] that meets the requirements of [Rule 56(c)(4)] and the affiant [or declarant] must be a person through whom the exhibits could be admitted into evidence."  10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2722 (2008).  With the exception of emails attached to the declarations of McCall and Odom, all of the emails submitted by Plaintiff Carroll in both the first and second notices of supplementary materials are inadmissible and will not be considered by the court because they are unauthenticated. [1:08-CV-2514, Doc. 147, Ex. A; Doc. 151, Ex. C].

34

The declaration of Collier describes his experience as an employee of the Lenox Square Grill, another restaurant allegedly owned by Greg Greenbaum. Collier's declaration mostly describes personnel actions which, as discussed *supra*, are not relevant to Plaintiff's claims. [Collier Dec. ¶¶ 3-9, 11-13]. Collier's statements which do not involve personnel actions are based on hearsay and speculation. [Collier Dec. ¶¶ 10, 14, 15]. For example, Collier asserts that Greenbaum informed Stephanie Sweeney, the alleged operating partner at the Lenox Square Grill, to take certain actions with regard to employees and customers based on their race. [Collier Dec. ¶ 10]. But Collier states that his knowledge of Greenbaum's alleged instructions to Sweeney is based "[u]pon information and belief." [Id.]. This statement is not made on personal knowledge as required by Rule 56(c)(4) but is hearsay that will not be considered by the court. Collier also states that he believes that the Lenox Square Grill did not serve certain beverages "because Greg Greenbaum wished to discourage African-American clientele from the restaurant." [Collier Dec. ¶ 14]. As discussed *supra*, the court will not consider an employee's opinion testimony which amounts to speculation on the motivations behind Greenbaum's decisions about what beverages to serve. The court also notes that the events described by Collier occurred more than three years after the incident in the present case. [Collier Dec. ¶ 3]. The undersigned

35

concludes that the declaration of Collier is inadmissible and unduly prejudicial.  For these reasons, the court **DENIES** Plaintiff Carroll's motion for an extension of time to file the supplemental discovery materials and motion to allow late-filed evidence to the extent these motions seek to admit the unauthenticated emails and the Collier declaration into the record.  [1:08-CV-2514, Docs. 155, 157].

The declarations of McCall and Odom consist of descriptions of the manner in which they were treated as customers of the Tavern.  Each African-American man alleged that on one occasion, while he was sitting at the Tavern bar, he was asked by employees to relinquish his seat.  [McCall Dec. ¶¶ 5-7; Odom Dec. ¶¶ 7-10].  Odom was with a friend and McCall was apparently by himself when these incidents took place.  [McCall Dec. ¶¶ 2-7; Odom Dec. ¶¶ 2-10].  Both men stated that when they were asked to give up their seats, there were white men at the bar who were not asked to move.  [McCall Dec. ¶¶ 4, 5; Odom Dec. ¶ 11].  The court finds that these two declarations are made on personal knowledge and satisfy the requirements of Rule 56(c)(4).  Accordingly, the court **GRANTS** Plaintiff Carroll's motion for an extension of time to file the supplemental discovery materials and motion to allow late-filed evidence to the extent these motions seek to admit the McCall and Odom declarations into the record.  [1:08-CV-2514, Docs. 155, 157].

The undersigned, however, need not and will not consider these two declarations when evaluating Defendants' summary judgment motions.  Unlike Plaintiffs Carroll and Shaw, McCall and Odom do not allege that they were escorted out of the restaurant; instead, the only complaint made by each declarant is that they were asked to give up their seats at the bar.  [McCall Dec. ¶¶ 5-7; Odom Dec. ¶¶ 7-10].  Moreover, McCall and Odom describe events at the Tavern which occurred two to four years after the incident in the present case.  [McCall Dec. ¶ 2; Odom Dec. ¶ 2].  Based on these facts, the relevancy of the two declarations at summary judgment is doubtful.  Moreover, as Defendants note, they "will be prejudiced by the consideration of this late filed evidence because they have not had an opportunity to investigate and rebut the allegations through written discovery and depositions."  [Doc. 162 at 8].  Finally, these declarations need not be addressed at this stage of the proceedings because, as discussed *infra*, the court has already concluded that the evidence previously submitted by Plaintiffs is sufficient to create a genuine issue of material fact on Plaintiffs' discrimination claims.

Plaintiff Carroll's motion for an extension of time to file supplemental discovery materials and motion to allow late-filed evidence are **GRANTED IN PART AND DENIED IN PART**.  [1:08-CV-2514, Docs. 155, 157].  Defendants' motion [1:08-

37

CV-2514, Doc. 154] to strike these materials is procedurally improper and, therefore, is **DENIED**.  See Sum of $66,839.59 Filed in Registry of Court v. I.R.S., 119 F. Supp. 2d 1358, 1359 n.1 (N.D. Ga. 2000) ("With respect to the IRS' motion to strike, because a motion to strike is only appropriate with regard to a pleading and an affidavit is not a pleading (see Fed. R. Civ. P. 7), the motion to strike Calloway's affidavit is procedurally improper.").  However, insofar as Defendants' motion to strike is an objection to the late-filed supplementary materials being considered by the court in addressing the summary judgment motions, it is **SUSTAINED** for the reasons previously discussed.

## III.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (amended 2010). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The standard for

granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).

The movant bears the initial burden of asserting the basis of his motion, and that burden is a light one.  See Celotex, 477 U.S. at 323, 106 S. Ct. at 2553.  The movant is not required to negate his opponent's claim.  See id.  Rather, the movant may discharge this burden merely by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S. Ct. at 2554.

When evaluating a motion for summary judgment, the court must view the evidence and factual inferences in the light most favorable to the nonmoving party. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." Fickling v. United States, 507

39

F.3d 1302, 1304 (11th Cir. 2007) (citing <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990)).  The court will apply these standards in ruling on the motions for summary judgment.

## IV.   Discussion

Plaintiffs Joe Barry Carroll and Joseph Shaw allege that Defendants CentraArchy and the Tavern subjected them to discrimination on the basis of race. [1:08-CV-2514, Doc. 74; 1:08-CV-2554, Doc. 1].  Plaintiffs assert that Defendants' actions constitute racial discrimination in a place of public accommodation in violation of 42 U.S.C. § 2000a ("Title II") and racial discrimination in contractual relations in violation of 42 U.S.C. § 1981.  [<u>Id.</u>].  Plaintiff Carroll has also asserted state law claims of intentional infliction of emotional distress, tortious misconduct, negligent or reckless infliction of emotional distress, and wrongful eviction.  [1:08-CV-2514, Doc. 74 at 15-18].

### A.     Plaintiffs' Claims of Racial Discrimination

Plaintiffs Carroll and Shaw allege that Defendants CentraArchy and the Tavern violated 42 U.S.C. § 1981 and Title II by discriminating against them on the basis of their race, African-American.  [1:08-CV-2514, Doc. 74; 1:08-CV-2554, Doc. 1]. Section 1981 provides:

40

(a)  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)  . . . For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c)  . . . The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.  A plaintiff bringing a claim based on § 1981 must establish "that the defendant failed to perform a contractual obligation as a result of intentional discrimination on the basis of race." Slocumb v. Waffle House, Inc., 365 F. Supp. 2d 1332, 1337 (N.D. Ga. 2005) (citing General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391, 102 S. Ct. 3141, 3150, 73 L. Ed. 2d 835 (1982)).

Title II provides:  "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a.  Both § 1981 and Title II require a plaintiff to prove intentional discrimination on the basis of race.

41

"The inquiry for a § 2000a claim, therefore, is essentially the same for a § 1981 claim." Solomon, 365 F. Supp. 2d at 1331. "The traditional burden-shifting framework made applicable to Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), also applies to Plaintiffs' claims under § 1981 and Title II." Afkhami v. Carnival Corp., 305 F. Supp. 2d 1308, 1321 (S.D. Fla. 2004); accord Jackson, 413 F. Supp. 2d at 1355-56 (applying the McDonnell Douglas burden shifting scheme to claims brought pursuant to both § 1981 and Title II); Solomon, 365 F. Supp. 2d at 1321-22 (same).

"In order to prove a *prima facie* case of 'disparate treatment' discrimination, a plaintiff may prove his or her case through (1) direct evidence of discrimination, (2) pattern and practice evidence of discrimination, or (3) circumstantial evidence of discrimination." Afkhami, 305 F. Supp. 2d at 1320 (citing Aurel v. School Bd. of Miami-Dade County Public Schools, 261 F. Supp. 2d 1375, 1377 (S.D. Fla. 2003)). Direct evidence is defined as "'evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption. Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence.'" Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999) (quoting Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997)). "Under the pattern

and practice theory of discrimination, a plaintiff must provide evidence sufficient to establish that impermissible discrimination was the defendant's standard operating procedure through a combination of historical, anecdotal, or statistical evidence." Afkhami, 305 F. Supp. 2d at 1320-21.   Circumstantial evidence of intentional discrimination is that which "suggests, but does not prove, a discriminatory motive. . . ." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004).

In the present case, the court finds that Plaintiffs are not able to offer direct evidence of racial discrimination.   There are no statements made by Defendants' employees that Plaintiffs were asked to relinquish their seats or were escorted out of the Tavern because they are African-American.   The evidence offered by Plaintiffs requires a factfinder to infer or presume racially discriminatory intent in the actions taken by Defendants' employees against Plaintiffs.   As noted *supra*, this type of evidence is not direct evidence of racial discrimination.   Taylor, 175 F.3d at 867.

Plaintiffs contend that they are able to offer evidence of a pattern or practice of racial discrimination.   Defendants, however, argue that individual plaintiffs are "foreclosed from pursuing pattern or practice claims for alleged violations of 42 U.S.C. §§ 1981 and 2000a." [Doc. 116 at 16].  Defendants base this argument on the Eleventh Circuit's holding in Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955 (11th Cir.

43

2008), which involved claims for employment discrimination based on Title VII and § 1981.  In <u>Davis</u>, the Eleventh Circuit held that individuals cannot bring pattern or practice claims unless they are brought as class actions.  <u>Id.</u> at 963-64, 967-69. Because Plaintiffs in the present case are not seeking to establish class certification, the court agrees with Defendants that Plaintiffs cannot bring a pattern or practice claim. Nevertheless, any evidence regarding discriminatory practices or procedures which may have been relevant to a pattern or practice claim may also be considered by the court in its evaluation of circumstantial evidence of alleged racial discrimination.

For disparate treatment claims based on circumstantial evidence, the plaintiff carries the burden of demonstrating that the defendant has unlawfully discriminated against him.  <u>See</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  The allocation of burdens and order of presentation of proof are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence; (2) if the plaintiff proves the *prima facie* case, the court will presume discriminatory intent, and the burden (of production) then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the action taken against the employee; and (3) if the defendant carries this burden, the presumption of discrimination is eliminated, and the plaintiff has an

opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the defendant was a pretext for discrimination. See McDonnell Douglas, 411 U.S. at 802-04, 93 S. Ct. at 1824-25; Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642-43 (11th Cir. 1998).

In order to establish a *prima facie* case of racial discrimination under § 1981, Plaintiffs must show that: (1) they are members of a protected class; (2) the allegedly discriminatory conduct concerned one or more of the activities enumerated in § 1981, i.e., the making, performance, modification, or termination of contracts, or the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship; and (3) that the defendant treated the plaintiffs less favorably with regard to the allegedly discriminatory act than the defendant treated other similarly situated persons who were outside plaintiffs' protected class. Benton, 230 F. Supp. 2d at 1370. A similar *prima facie* formulation for Title II claims requires plaintiffs to show that they: (1) are members of a protected class; (2) attempted to contract for services and afford themselves the full benefits and enjoyment of a public accommodation; (3) were denied the full benefit or enjoyment of a public accommodation; and (4) such services were available to similarly situated persons outside plaintiffs' protected class who received full benefits or who were treated better than plaintiffs. Solomon, 365 F. Supp.

45

2d at 1331.  The court finds that Plaintiffs are able to establish a *prima facie* case of racial discrimination for both their Title II public accommodation claims and their § 1981 contractual relations claims.

Plaintiffs Carroll and Shaw are able to satisfy the first *prima facie* element under both statutes because, as African-Americans, they are members of a protected class. With regard to the second element of their § 1981 claims, Plaintiffs must show that the allegedly discriminatory conduct concerned the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.  Benton, 230 F. Supp. 2d at 1370. Similarly, to establish the next two *prima facie* elements of their Title II claims, Plaintiffs must establish that they attempted to contract for services and afford themselves the full benefits and enjoyment of a public accommodation but were denied the full benefit or enjoyment of a public accommodation.  Solomon, 365 F. Supp. 2d at 1331.

Defendants argue that when Plaintiffs Carroll and Shaw were asked to relinquish their seats at the bar, they were not denied any rights, benefits, or privileges protected by § 1981 or denied the full benefit or enjoyment of a public accommodation.  [1:08-CV-2554, Doc. 100 at 14].  Defendants point out that Plaintiffs were served everything they ordered and were even offered free drinks to give up their seats for two women

46

who were standing at the bar.  [Id.].  The evidence supports Defendants' contention on this issue.  As Plaintiffs Carroll and Shaw were sitting at the bar in the Tavern and in the process of finishing their appetizers, two white women walked up behind them and were waiting for seats at the bar.  [DSMFC ¶ 5; DSMFS ¶ 5; Carroll Dep. at 55, 63].  One of the Tavern's bartenders, Patrick Kelly, asked Plaintiffs to relinquish their seats to the two women, but Plaintiffs declined.  [SSMF ¶ 24; CSMF ¶ 23].  By this time, they were not finished with their drinks, but they had finished their appetizers.  [SSMF ¶ 25; CSMF ¶ 24; Carroll Dep. at 49-50; Shaw Dep. at 76].  Kelly indicated that it was the custom and practice for men to give up their seats to women at the Tavern's bar, and he asked the men a second time to give up their seats.  [SSMF ¶ 26; CSMF ¶ 25].  Kelly also asked whether Plaintiffs would be willing to give up their seats to the ladies standing behind them in exchange for a free round of drinks, but Plaintiffs again declined.  [DSMFC ¶¶ 6, 7; DSMFS ¶¶ 6, 7; Carroll Dep. at 49-50, 95; Shaw Dep. at 60-61, 79; Kelly Dep. at 75-76].  Operating partner Heather Dennis and manager Rick Russell then spoke to Plaintiffs, and both stated that it was the practice at the Tavern for male customers to relinquish their seats to female customers.  Dennis then asked Carroll and Shaw to vacate their seats, but Plaintiffs again declined and responded that

they were not ready to leave.   [SSMF ¶¶ 33, 34; CSMF ¶¶ 32, 33; DSMFC ¶ 9; DSMFS ¶ 9].

The court finds that at this point in the incident, Plaintiffs had not been denied the enjoyment of any rights, benefits or privileges protected by § 1981, or the full benefit or enjoyment of a public accommodation.  The court, therefore, agrees with Defendants that if these actions were the only ones which formed the basis of Plaintiffs' § 1981 and Title II claims, then summary judgment would be warranted. The problem with Defendants' argument is that they seek to separate Plaintiffs' claims into one based on the requests to give up their seats and another one based on being escorted out of the Tavern. [1:08-CV-2554, Doc. 100 at 12-22].  Plaintiffs' § 1981 and Title II claims, however, are based on all of the circumstances that occurred on the evening of August 11, 2006.  In light of the totality of the circumstances, the court finds that Plaintiffs have offered sufficient evidence to allow a reasonable jury to conclude that Plaintiffs were denied the enjoyment of rights, benefits, or privileges protected by § 1981 and the full benefit or enjoyment of a public accommodation.

After Plaintiffs refused to give up their seats at the bar, operating partner Dennis became increasingly more irritated. [SSMF ¶ 39; CSMF ¶ 38].  Dennis began speaking loudly and indicated repeatedly that, if Carroll and Shaw did not relinquish their seats,

48

they would have to leave the restaurant and that she would call the police if they did not leave.  [Carroll Dep. at 96-97; SSMF ¶ 40; CSMF ¶ 39; DSMFC ¶¶ 11, 15; DSMFS ¶ 13].   Plaintiffs refused to leave and urged Dennis to call the police. [DSMFC ¶ 16; DSMFS ¶ 14; Carroll Dep. at 96-97].  Carroll told Dennis, "Yes, you should call the police. . . . Because we needed this to be–I needed some record of this. I needed somebody, a third party to come in here and witness what was happening." [Carroll Dep. at 97].  Dennis then called Nehemiah Sanders, a City of Atlanta police officer who provides off-duty security for the Tavern.  [DSMFC ¶ 17; DSMFS ¶ 15]. Officer Sanders, who had on his uniform, badge, and gun, arrived within fifteen minutes of being called by Dennis and explained to Plaintiffs that it was the practice of the Tavern to ask male customers sitting at the bar to give up their seats to female customers standing and waiting for a seat.  [SSMF ¶¶ 43, 46; CSMF ¶¶ 42, 45; Dennis Dep. at 46; DSMFC ¶ 19; DSMFS ¶ 17].   Shortly after this conversation, Officer Sanders escorted Plaintiffs Carroll and Shaw out of the Tavern.  [DSMFC ¶ 21; DSMFS ¶ 18; Carroll Dep. at 118-19; Shaw Dep. at 106-07].  Plaintiffs were not disorderly or disruptive in any way. [SSMF ¶¶ 47, 48; CSMF ¶¶ 46, 47; DSMFC ¶ 20; Carroll Dep. at 113].

49

Although Plaintiffs received their ordered food and drink before being escorted out of the restaurant, this does not establish that Plaintiffs are precluded from bringing a § 1981 or Title II discrimination claim. Plaintiffs were sitting at the bar and drinking, and patrons at a bar are often seeking the enjoyment of intangible benefits such as atmosphere and interaction with other people, rather than simply food and drink. The court concludes that a reasonable jury could find that Defendants' actions in calling security and having an armed police officer escort Plaintiffs out of the Tavern effectively denied Plaintiffs the enjoyment of benefits and privileges protected by § 1981 and the full benefit or enjoyment of a public accommodation. See Jackson, 413 F. Supp. 2d at 1363 ("For purposes of determining whether a *prima facia* case has been made, the court finds that by ordering Brenda French to leave the restaurant, Waffle House denied Brenda French the full benefits and enjoyment of a place of public accommodation.").

The final *prima facie* element requires Plaintiffs to show that Defendants treated them less favorably than other similarly situated persons who were outside the Plaintiffs' protected class. See Benton, 230 F. Supp. 2d at 1370. The court finds that Plaintiffs are able to carry this burden. Plaintiff Carroll testified that after bartender Patrick Kelly asked Plaintiffs to move out of their seats because it was the custom for

50

men to give up their seats to women at the bar, Carroll looked toward the other end of the bar and saw "a white man, and there was an empty seat–there were empty seats besides [sic] him and there was a guy standing by a seat.  So there were seats down there. . . ." [Carroll Dep. at 76].  Carroll testified that he told Tavern employees, "There's a guy down there.  Why don't you ask him for his seat?  And they told us, They don't want those seats.  They want your seats." [Carroll Dep. at 76].  Similarly, Plaintiff Shaw testified that there was a white male at the bar and two empty seats beside him.  [Shaw Dep. at 82-83].  Shaw further testified that he and Carroll got into a conversation with manager Rick Russell after he and operating partner Heather Dennis again asked for Plaintiffs to move out of their bar seats.  [Shaw Dep. at 89; SSMF ¶¶ 33, 34; CSMF ¶¶ 32, 33; DSMFC ¶ 9; DSMFS ¶ 9].  Shaw testified that he and Carroll told Russell, "Well, you know, there's another male sitting at the other end of the bar; why isn't he being asked to give up his seat?  And Mr. Russell says, Well, they want your seats, you know, so don't worry about that." [Shaw Dep. at 89].  According to Shaw, he also said to Russell:

> So what's the problem here? You know, we are the only African-American people at the bar and . . . you're bugging us about two seats; what's the problem? . . . And, you know, given the history of this country, with people sitting at bars and student sit-ins, and all this type of stuff, so people can sit at counters, why are you bugging us about some

51

bar?  What's the problem?  You know, it seems awful–it seems like you're making an awful big deal out of two bar seats.

[Shaw Dep. at 111-12].

Another bartender named Ramon Arocha testified that around the time Plaintiffs were being asked to give up their seats, a white man and an Indian man were sitting at the other end of the bar. [Arocha Dep. at 38-42, 84-86]. According to Arocha, he was working the opposite end of the bar from where Plaintiffs were sitting, and Kelly approached him and told him that "we have two gentlemens [sic] here who don't want to give up the seat." [Arocha Dep. at 38-41, 43]. Arocha stated that he saw the other Tavern employees asking Plaintiffs to give up their seats. [Arocha Dep. at 43-45]. He then realized that he had two men sitting at his end of the bar. [Arocha Dep. at 41-42, 84-86]. Arocha asked the women who were standing at the bar if they wanted the seats occupied by these two men, and he then asked the men to give up their seats for the two women. [Arocha Dep. at 41-42, 84-86]. According to Arocha, both the white man and the Indian man gave up their seats, and the two women sat down in those seats. [Arocha Dep. at 41-42].

The evidence of this incident, when viewed in the light most favorable to Plaintiffs, establishes that at the time Tavern employees asked Plaintiffs to move from

their seats, there were empty seats available at the bar. [Carroll Dep. at 76; Shaw Dep. at 82-83, 89]. Plaintiffs were the only African-American men sitting at the bar, while a white man and an Indian man were also in seats at the bar. [Carroll Dep. at 76; Shaw Dep. at 111-12; Arocha Dep. at 38-42, 84-86]. Bartender Kelly, manager Russell, and operating partner Dennis all approached Plaintiffs and at various times asked them to move out of their bar seats, while there were empty seats at the bar and the white man and the Indian man sat at the bar without being asked to move. [Shaw Dep. at 89; SSMF ¶¶ 33, 34; CSMF ¶¶ 32, 33; DSMFC ¶ 9; DSMFS ¶ 9]. Testimony from bartender Ramon Arocha reveals that even after Plaintiffs were repeatedly asked and declined to give up their seats, no member of the Tavern's management ever asked the white man or the Indian man to give up their seats. [Arocha Dep. at 38-42, 84-86]. Instead, bartender Arocha made the decision on his own to ask the two women who were standing at the bar if they wanted the seats occupied by the white man and the Indian man, and he then asked the men to give up their seats for the two women. [Arocha Dep. at 41-42, 84-86]. This evidence is sufficient to show that similarly situated persons outside Plaintiffs' protected class were treated more favorably. Benton, 230 F. Supp. 2d at 1370.

It appears that even after the two women were seated, members of management continued to ask Plaintiffs to get out of their seats at the bar. [Carroll Dep. at 96-97; SSMF ¶ 40; CSMF ¶ 39; DSMFC ¶¶ 11, 15; DSMFS ¶ 13; Arocha Dep. at 41-42, 84-86]. Dennis began speaking loudly and indicated repeatedly that, if Carroll and Shaw did not relinquish their seats, they would have to leave the restaurant and that she would call the police if they did not leave. [Carroll Dep. at 96-97; SSMF ¶ 40; CSMF ¶ 39; DSMFC ¶¶ 11, 15; DSMFS ¶ 13]. Plaintiffs refused and told her, "Yes, you should call the police. . . . Because we needed . . . a third party to come in here and witness what was happening." [Carroll Dep. at 96-98]. Despite the fact that Plaintiffs were not disorderly or disruptive in any way, Dennis called Officer Sanders, an off-duty City of Atlanta police officer, and he escorted Plaintiffs out of the Tavern. [DSMFC ¶¶ 17, 19-21; DSMFS ¶¶ 15, 17, 18; Carroll Dep. at 113, 118-19; Shaw Dep. at 106-07; SSMF ¶¶ 46-48; CSMF ¶¶ 45-47]. No other patron at the Tavern that evening was escorted off the premises by an armed officer. In light of this evidence, the undersigned finds that Plaintiffs have offered evidence which would allow a reasonable jury to conclude that Defendants treated them less favorably than other similarly situated persons who were outside the Plaintiffs' protected class. Therefore,

they are able to establish the final *prima facie* element on both their § 1981 and Title II claims.[6]

Because Plaintiffs have established a *prima facie* case of racial discrimination, the burden of production then shifts to Defendants to articulate some legitimate, non-discriminatory reason for the action taken against Plaintiffs.  See Combs v. Plantation Patterns, 106 F. 3d 1519, 1528 (11th Cir. 1997) (citing McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; Burdine, 450 U.S. at 254, 101 S. Ct. at 1094).  "'[T]o satisfy this intermediate burden, the [defendant] need only produce admissible evidence which would allow the trier of fact rationally to conclude that the [adverse] decision had not been motivated by discriminatory animus.'"  Id. (quoting Burdine, 450 U.S. at 257, 101 S. Ct. at 1096).  "'[T]he defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'"  Id. (quoting Burdine, 450 U.S. at 254-55, 101 S. Ct. at 1094).  The defendant's burden in the rebuttal stage is "'exceedingly light.'"  Walker v. NationsBank of Florida N.A., 53

---

[6]As discussed *infra* with regard to Plaintiffs' pretext arguments, the court also finds that they have offered other evidence showing that Defendants' adverse actions were taken against Plaintiffs "under circumstances which give rise to an inference of unlawful discrimination."  Burdine, 450 U.S. at 253, 101 S. Ct. at 1094.

55

F.3d 1548, 1556 (11th Cir. 1995) (quoting <u>Perryman v. Johnson Products Co., Inc.</u>, 698

F.2d 1138, 1142 (11th Cir. 1983)).

Defendants assert that Tavern employees asked Plaintiffs Carroll and Shaw to

give up their seats at the bar because the employees wanted to allow two women who

were standing to have seats.   [1:08-CV-2554, Doc. 100 at 5-8].   According to

Defendants, the Tavern has an unwritten practice of asking male customers sitting at

the bar to give up their seats to female customers standing and waiting for a seat.

[DSMFC ¶ 1; DSMFS ¶ 1].   Defendants assert that they did not apply the policy to

Plaintiffs in a racially discriminatory manner.   Instead, Defendants claim that the

Tavern employees asked Plaintiffs to give up their seats because the women were

standing behind Carroll and Shaw and because they were in adjacent seats.   [1:08-CV-

2554, Doc. 100 at 5-7 and Doc. 116 at 19-20].   Defendants note that Plaintiffs were

even offered a free round of drinks to give up their seats.   [DSMFC ¶ 6; DSMFS ¶ 6;

Carroll Dep. at 49-50, 95; Shaw Dep. at 60-61, 79; Kelly Dep. at 75-76].

Defendants contend that Dennis called security and had Plaintiffs escorted out

of the restaurant not on the basis of their race but because they refused to relinquish

their seats and refused to leave the Tavern.   [Doc. 100 at 7].   After Dennis became

more irritated during the exchange with Plaintiffs, she told them that she would call the

56

police if they did not leave.  [Carroll Dep. at 96-97; SSMF ¶ 40; CSMF ¶ 39; DSMFC ¶¶ 11, 15; DSMFS ¶ 13].  Plaintiffs responded by telling her, "Yes, you should call the police."  [Carroll Dep. at 96-98].  Defendants assert that because Plaintiffs essentially invited Dennis to call the police, she called Officer Sanders, and he escorted them out of the restaurant.  [DSMFC ¶¶ 17, 19-21; DSMFS ¶¶ 15, 17, 18; Carroll Dep. at 113, 118-19; Shaw Dep. at 106-07; SSMF ¶¶ 46-48; CSMF ¶¶ 45-47].  The court finds, and Plaintiffs acknowledge, that Defendants have satisfied their "exceedingly light" burden of producing a legitimate, non-discriminatory reason for asking Plaintiffs to give up their seats and escorting them out of the Tavern.  [1:08-CV-2514, Doc. 119 at 29].

Once a defendant meets its burden of production, "the presumption of discrimination created by the McDonnell Douglas framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'"  Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S. at 255 & n.10, 101 S. Ct. at 1094-95 & n.10).  The plaintiff then has the opportunity to show that the defendant's proffered reason for taking an adverse action against the plaintiff "is a mere pretext for discrimination."  Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) (citing McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. at 1825).  "[A] plaintiff may not in all cases merely rest on the laurels of [his] *prima facie* case in the face of powerful justification evidence

57

offered by the defendant." <u>Grigsby v. Reynolds Metals Co.</u>, 821 F.2d 590, 596 (11th

Cir. 1987). The plaintiff's demonstration of pretext merges with his "ultimate burden

of showing that the defendant intentionally discriminated against the plaintiff."

<u>Holifield</u>, 115 F.3d at 1565 (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511,

113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993)). This task is a highly focused one.

The court "must, in view of all the evidence, determine whether the plaintiff has

cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit

a reasonable factfinder to conclude that the [defendant's] proffered 'legitimate reasons

were not what actually motivated its conduct[.]'" <u>Combs</u>, 106 F.3d at 1538 (quoting

<u>Cooper-Houston v. Southern Ry. Co.</u>, 37 F.3d 603, 605 (11th Cir. 1994)). The plaintiff

"'may succeed in this either directly by persuading the court that a discriminatory

reason more likely motivated the [defendant] or indirectly by showing that the

[defendant's] proffered explanation is unworthy of credence.'" <u>Jackson v. State of</u>

<u>Alabama State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005) (citation

omitted). In order to establish pretext through the indirect method, the plaintiff "must

demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the [defendant's] proffered legitimate reasons for its action that a

58

reasonable factfinder could find them unworthy of credence." McCann v. Tillman, 526 F.3d 1370, 1375-76 (11th Cir. 2008) (citations and internal quotation marks omitted).

Plaintiffs Carroll and Shaw argue that testimony from former Tavern employees about the type of clientele desired by management and the treatment of African-American customers could allow a reasonable jury to find that Defendants' proffered reasons are pretexts for racial discrimination. Sheena Norris, a former employee of the Tavern, testified that operating partner Heather Dennis told her that the desired clientele for the bar area was "white businessmen and well-endowed women, usually having blonde hair, big boobs, that type of thing." [Norris Dep. at 126]. Norris also testified that on one occasion in 2005 or 2006, she was instructed by Dennis to ask two African-American men to give up their seats at the bar despite the fact that they were not finished eating. [Norris Dep. at 46-50]. This was contrary to the normal practice at the Tavern, which was not to ask customers to move if they were mid-service, that is, if they were still eating or waiting for ordered food. [SSMF ¶ 15; CSMF ¶ 15; Angulo Dep. at 95; Greenbaum Dep. at 61]. Norris testified to the following:

A.     As long as I was asking somebody who was close to being finished, or was just sitting there talking, or getting ready to pay a bill, that was fine. . . .  [I]f you're just sitting there drinking, and you've already paid your tab, you know, it would be okay to ask them to move, because they are pretty much finished. . . .

59

Q.   Well, what happened that you thought was a problem?

A.   Well, what happened that I thought was a problem was that there were other people that were finished, and because an African-American [was] sitting there, that's the person that I had to ask first.

Q.   Who told you to ask the African-American?

A.   Heather Dennis.

Q.   And what did Heather Dennis say to you?

A.   When I went and I told her that people are pretty much eating or whatever, she said, Well, there's two men . . . sitting right there, two African-American men.  I told her who they suggested, the bartenders, who they suggested to move.  And she told me no. And she told me who to ask.  And that's . . . who I had to ask.

Q.   And she said, Ask the two African-American men?

A.   Yes, she did.

[Norris Dep. at 46-48].

Bartender Michael Murphy, who worked at the Tavern in 2005 and 2006, testified that on one occasion, Dennis instructed bartenders during a pre-shift meeting to slow serve black patrons at the bar. [Murphy Dep. at 94-96].  According to Murphy, Dennis told the bartenders that if they "saw a black patron or group of them standing at the bar waiting for drinks," then the bartenders were to "let them wait as long as possible" before serving them.  [Id.].  Murphy stated that this incident occurred in late 2005 or early 2006, approximately seven to nine months before the incident involving Plaintiffs.  [Murphy Dep. at 95].  Heather Dennis was asked and testified to the following:

60

> Q. Do you recall ever telling any of your bartenders that if they saw black patrons waiting at the bar in The Tavern that they were to let those patrons wait as long as they possibly could before serving them?
>
> A. There was only one incident where that happened. . . . [Greg Greenbaum] told me to tell the bartenders to make the two people standing at the end to wait for a long–for a period of time before being served. . . .
>
> Q. What was the race of those patrons?
>
> A. They were black.
>
> Q. They were black males?
>
> A. No, they were females.

[Dennis Dep. at 192-93]. The court also notes that although it was the normal practice at the Tavern not to ask any customer at the bar to move if there were already open seats, Plaintiffs allege that they were asked to move while empty seats were available. [SSMF ¶ 14; CSMF ¶ 14]. The court finds that this evidence is sufficient to satisfy Plaintiffs' burden at the pretext stage.

According to Norris, Dennis stated that the desired clientele for the Tavern's bar, "the clientele that they were trying to pull in for this bar," was "white businessmen and well-endowed women, usually having blonde hair, big boobs, that type of thing." [Norris Dep. at 126]. Dennis' statement to Norris about the desired clientele for the bar is significant because as an operating partner at the time the statement was allegedly made, she was a part of the Tavern's management who made managerial

61

decisions such as when to call security to remove a customer.  [Dennis Dep. at 28-47, 162-63].  Murphy's testimony that on one occasion Dennis instructed bartenders to slow serve black patrons reveals a racially motivated action taken against African-American customers less than a year before the incident involving Plaintiffs.  [Murphy Dep. at 94-96].  In addition, the testimony of Norris and Murphy concerned statements made by Dennis, the member of management who confronted Plaintiffs and called security to have them escorted out of the establishment when they refused to relinquish their seats.  [Dennis Dep. at 28-47, 162-63].

The undersigned finds that this evidence, when viewed in the light most favorable to Plaintiffs, casts "sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the [defendant's] proffered 'legitimate reasons were not what actually motivated its conduct[.]'"  Combs, 106 F.3d at 1538 (quoting Cooper-Houston, 37 F.3d at 605).  A reasonable jury could find that the Tavern employees involved in the incident with Plaintiffs were motivated by racially discriminatory animus when they asked Plaintiffs to give up their bar seats and had them escorted off the premises by a police officer.  Because Plaintiffs have presented sufficient evidence to establish pretext, the undersigned **RECOMMENDS** that Defendants' summary judgment motions [1:08-

62

CV-2514, Doc. 112; 1:08-CV-2554, Doc. 100] be **DENIED** on Plaintiffs' § 1981 claims for racial discrimination in contractual relations and their Title II claims for racial discrimination in a place of public accommodation.

### B.   Injunctive Relief Pursuant to Title II

A plaintiff bringing a claim based on Title II can only obtain injunctive relief. Damages are not available.  42 U.S.C. § 2000a-2.  As the Supreme Court held in City of Los Angeles v. Lyons, 461 U.S. 95, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983), a plaintiff seeking injunctive relief must show a "real or immediate threat that the plaintiff will be wronged again–a 'likelihood of substantial and immediate irreparable injury.'"  Id. at 111, 103 S. Ct. at 1670 (quoting O'Shea v. Littleton, 414 U.S. 488, 502, 94 S. Ct. 669, 679, 38 L. Ed. 2d 674 (1974)); accord Solomon, 365 F. Supp. 2d at 1330.  In the present case, Defendants argue that Plaintiffs lack standing to seek injunctive relief because they "have not been back to The Tavern since the Incident, and neither is interested in patronizing The Tavern again."  [1:08-CV-2554, Doc. 110 at 25].  Defendants' argument on this issue is unpersuasive.

Defendants cite to only one page in the deposition of Plaintiff Shaw to show that Plaintiffs have no interest in returning to the Tavern, but this portion of Shaw's deposition only reveals that he has not been back to the Tavern since the incident.

[Shaw Dep. at 135].  Moreover, Shaw stated in his declaration that he would patronize the Tavern, including the bar area, if the allegedly discriminatory practices were eliminated.  [1:08-CV-2554, Doc. 109, Shaw Dec. ¶¶ 3, 4].  As Plaintiffs correctly note [1:08-CV-2554, Doc. 108 at 24], courts in the Northern District of Georgia have found that this is sufficient to establish standing under Title II.  See Jackson, 413 F. Supp. 2d at 1365 (holding that plaintiff had standing to obtain injunctive relief because he "submitted a declaration stating that he would return to Waffle House if Waffle House amended its policies"); Solomon, 365 F. Supp. 2d at 1330-31 (holding that plaintiffs have standing because they "stated that they would visit Waffle House if its allegedly discriminatory policies were remedied").

With regard to Plaintiff Carroll, Defendants have produced no evidence in support of their summary judgment motions showing that Carroll would not return to the Tavern.  The undersigned concludes that in light of these facts, the proper course of action at this time is to recommend that Defendants' summary judgment motions be denied on the issue of Plaintiffs' standing to pursue injunctive relief.  If the district court chooses to allow further evidence to be heard on this issue, then it can do so at a later date and address any arguments regarding standing that Defendants may raise. See Givens v. Waffle House, Inc., 2006 WL 211710, at *10 (N.D. Ga. January 25,

64

2006) (holding that although "Plaintiffs testified they intend not to visit another Waffle House[,]" the court denied the defendant's summary judgment motion and "defer[red] ruling on Plaintiffs' standing to pursue injunctive relief until further evidence is heard on this issue at trial" because the plaintiffs' "testimony suggests their intentions may change if Waffle House changes its allegedly discriminatory practices").  The court, therefore, **RECOMMENDS** that Defendants' summary judgment motions [1:08-CV-2514, Doc. 112; 1:08-CV-2554, Doc. 100] be **DENIED** on the issue of whether Plaintiffs have standing to obtain injunctive relief pursuant to Title II.

### C.   Plaintiff Carroll's State Law Claims

In addition to Plaintiffs' federal claims, Plaintiff Carroll has asserted state law claims of intentional infliction of emotional distress, tortious misconduct, negligent or reckless infliction of emotional distress, and wrongful eviction.  [1:08-CV-2514, Doc. 74 at 15-18].  Carroll, however, notified Defendants and the court in his response to Defendants' summary judgment motion that he is dismissing with prejudice his claims for wrongful eviction and negligent or reckless infliction of emotional distress.  The court, therefore, **RECOMMENDS** that Defendants' summary judgment motion [1:08-CV-2514, Doc. 112] be **GRANTED** on Plaintiff Carroll's claims for wrongful eviction and negligent or reckless infliction of emotional distress and that these claims be

65

dismissed with prejudice. Carroll's remaining state law claims are for intentional infliction of emotional distress and tortious misconduct.

### 1.    Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under Georgia law, the plaintiff must show that the defendant's conduct was intentional or reckless; that the conduct was extreme and outrageous; that there is a causal connection between the conduct and the emotional distress suffered by the plaintiff; and that the plaintiff's emotional distress is severe. See Gaston v. Southern Bell Tel. and Tel. Co., 674 F. Supp. 347, 352 (N.D. Ga. 1987). A claim for intentional infliction of emotional distress requires more than an allegation that a plaintiff was offended or insulted. See Kornegay v. Mundy, 190 Ga. App. 433, 435, 379 S.E.2d 14, 16 (1989). In fact, the burden on the plaintiff is "a stringent one." Ingram v. JIK Realty Co., Inc., 199 Ga. App. 335, 404 S.E.2d 802 (1991). The conduct must "go beyond all possible bounds of decency, [so as] to be regarded as atrocious, and utterly intolerable in a civilized community." Norfolk Southern Ry. Co. v. Spence, 210 Ga. App. 284, 285, 435 S.E.2d 680, 681 (1993). The plaintiff must also produce evidence showing that he suffered emotional distress that was severe. Gaston, 674 F. Supp. at 352. Whether a claim is

66

sufficiently severe is a question of law.  See Johnson v. Savannah College of Art & Design, Inc., 218 Ga. App. 66, 67, 460 S.E.2d 308, 309 (1995).

Plaintiff Carroll cites Wal-Mart Stores, Inc. v. Johnson, 249 Ga. App. 84, 547 S.E.2d 320 (2001), overruled on other grounds by Ferrell v. Mikula, 295 Ga. App. 326, 672 S.E.2d 7 (2008), in support of his contention that Defendants' conduct was extreme and outrageous.  The plaintiff in Johnson was a fifty-four year-old black female who was forcibly detained by store employees investigating shoplifting, even though Johnson was never suspected of shoplifting.  Id. at 85, 547 S.E.2d at 322.  A member of the store's management radioed her staff to grab "the first black woman" coming out of the store.  Id.  When Johnson approached the exit after completing her shopping, a male employee ordered Johnson to "get on the floor."  Id.  When Johnson questioned his reason for detaining her, the employee pulled Johnson back into the store, forced her to the ground, and held her down on the floor in a stress hold until a police officer arrived and put her in handcuffs.  Id. at 85, 547 S.E.2d at 322-23.  All of these actions were taken against Johnson while approximately twenty customers and employees were watching.  Id.  Furthermore, Wal-Mart prosecuted Johnson for creating a disturbance even though the company confirmed that she was not suspected of shoplifting.  Id. at 87, 547 S.E.2d at 324.

67

In the present case, Defendants' conduct against Plaintiff Carroll was not sufficiently extreme and outrageous to bring a claim for intentional infliction of emotional distress, and it does not approach the level of misconduct found in <u>Johnson</u>, 249 Ga. App. 84, 547 S.E.2d 320.  When bartender Patrick Kelly approached Plaintiffs about relinquishing their seats at the bar, he asked them if they would be willing to give up their seats for two women in exchange for a free round of drinks.  [DSMFC ¶¶ 6, 7; DSMFS ¶¶ 6, 7; Carroll Dep. at 49-50, 95; Shaw Dep. at 60-61, 79; Kelly Dep. at 75-76].  Defendants correctly note that Plaintiff Carroll testified that during the entire incident, which lasted approximately twenty to thirty minutes, no one associated with the Tavern ever touched him or Shaw.  [1:08-CV-2514, Doc. 112 at 8; Carroll Dep. at 105, 124].  Carroll also acknowledged that he was not subjected to any profanity, racial slurs, or other offensive or demeaning language.  [<u>Id.</u>].  And although operating partner Heather Dennis spoke loudly during the incident, the other Tavern employees did not raise their voices to Plaintiffs.  [Carroll Dep. at 96-97, 105; SSMF ¶ 40; CSMF ¶ 39; DSMFC ¶¶ 11, 15; DSMFS ¶ 13].  Finally, Carroll testified that when Officer Sanders escorted Plaintiffs out of the restaurant, he acted in a professional manner.  [Carroll Dep. at 113].

68

The court finds that the misconduct allegedly committed by Defendants does not rise to the level of being "beyond all possible bounds of decency" or "of the sort which would arouse the resentment of an average member of the community and cause him to exclaim 'Outrageous!'" Johnson, 218 Ga. App. at 67, 460 S.E.2d at 309. Georgia courts have emphasized that a plaintiff asserting an intentional infliction claim must establish conduct that is "'of such serious import as to *naturally* give rise to such intense feelings of humiliation, embarrassment, fright or extreme outrage as to cause severe emotional distress.'" Peoples v. Guthrie, 199 Ga. App. 119, 121, 404 S.E.2d 442, 444 (1991) (citations omitted) (emphasis in original). Because a reasonable jury could not conclude that Carroll was subjected to extreme and outrageous conduct when he was asked to relinquish his seat and subsequently escorted out of the Tavern by a police officer, the court finds that his claim for intentional infliction of emotional distress cannot survive summary judgment. See Kirkland v. Earth Fare, Inc., 289 Ga. App. 819, 822-23, 658 S.E.2d 433, 437 (2008) (holding that the store manager's conduct in accusing the plaintiff-customer of sexually harassing female employees and of masturbating in the men's restroom was not sufficiently extreme or outrageous to support an intentional infliction of emotional distress claim).

69

The court also finds that Plaintiff Carroll has failed to establish the final element necessary to bring an intentional infliction claim because he has not offered evidence that he suffered severe emotional harm as a result of Defendants' actions. <u>Gaston</u>, 674 F. Supp. at 352. "'[E]motional distress includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is *extreme* that liability arises. The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it.'" <u>Abdul-Malik v. AirTran Airways, Inc.</u>, 297 Ga. App. 852, 858, 678 S.E.2d 555, 560 (2009) (citations omitted) (emphasis in original). Plaintiff Carroll testified that he was shocked and humiliated by his experience at the Tavern. [Carroll Dep. at 132]. However, he has not suffered any physical symptoms, has not taken any medications, has not received any medical treatment, and has not received any professional counseling from a healthcare provider, psychiatrist, psychologist, or social worker as a result of the incident. [Carroll Dep. at 132-47]. A reasonable jury could not examine the evidence before the court and conclude that Plaintiff Carroll suffered emotional distress that was severe. For all these reasons, the undersigned **RECOMMENDS** that Defendants' summary judgment motion [1:08-CV-2514, Doc. 112] be **GRANTED** on Plaintiff Carroll's state law claim

70

for intentional infliction of emotional distress and that this claim be dismissed with prejudice.

### 2. Tortious Misconduct

Plaintiff Carroll's remaining state law claim is for tortious misconduct. The principle upon which this tort is based is that:

> [o]ne who maintains a mercantile establishment for the purpose of selling goods owes a duty to a customer, lawfully in his store by his implied invitation for the purpose of transacting business, to protect the customer against the use of any unprovoked and unjustifiable opprobrious and insulting and abusive words by a clerk employed by him to deal with customers, tending to humiliate, mortify, and wound the feelings of the customer.

Doe v. Village of St. Joseph, Inc., 202 Ga. App. 614, 617, 415 S.E.2d 56, 58 (1992) (citations and internal quotation marks omitted). "[T]he gist of the right of recovery is not based on slander, but is based on the right of the invitee to be protected from any tortious misconduct on the part of the corporation from its agents and employees acting within the scope of their duties and about their master's business." Colonial Stores v. Coker, 74 Ga. App. 264, 266, 39 S.E.2d 429, 431 (1946) (citations and internal quotation marks omitted).

The court agrees with Defendants that Plaintiff Carroll has failed to offer sufficient evidence which would allow a jury to find that Defendants engaged in

71

tortious misconduct.  A common fact in each of the cases cited by Plaintiff in support of his claim was that an employee or agent of the defendant-business accused the plaintiff-customer of shoplifting or other unlawful activity in front of other customers. For example, in Revco Discount Drug Centers of Georgia, Inc. v. Famble, 173 Ga. App. 330, 326 S.E.2d 532 (1985), the appellate court affirmed judgment in favor of the plaintiff on his tortious misconduct claim after the plaintiff produced evidence showing that an employee told him that the employee "had previously caught [the plaintiff] stealing batteries from the store, and had prohibited [the plaintiff] at that time from returning to the store in the future."  Id. at 330, 326 S.E.2d at 533.  In Simmons v. Kroger Co., 218 Ga. App. 721, 463 S.E.2d 159 (1995), overruled on other grounds by Ferrell, 295 Ga. App. 326, 672 S.E.2d 7, the appellate court reversed the trial court's grant of summary judgment on the plaintiff's tortious misconduct claim because the plaintiff showed that a security guard followed the plaintiff out of the store and into the parking lot and, while numerous customers looked on, told the plaintiff that he had been seen eating some candy in the store.  Id. at 722-23, 463 S.E.2d at 161-62.  When the plaintiff attempted to walk away, the security guard grabbed the plaintiff by the arm and told him that he would be arrested for resisting arrest if he did not come back inside the store with the guard.  Id.  In both Zayre of Atlanta, Inc. v. Sharpton, 110 Ga.

72

App. 587, 139 S.E.2d 339 (1964), and <u>Mansour v. Mobley</u>, 96 Ga. App. 812, 101 S.E.2d 786 (1957), the courts affirmed the judgments in favor of the respective plaintiffs on their tortious misconduct claims because the evidence revealed that employees accosted the plaintiffs and loudly accused them of shoplifting while other customers heard the false accusations.

Defendants note that in <u>Mitchell v. Lowe's Home Centers, Inc.</u>, 234 Ga. App. 339, 506 S.E.2d 381 (1998), the appellate court affirmed the trial court's decision to grant summary judgment in favor of the defendant on the plaintiff's tortious misconduct claim.  The customer service representative assisting the plaintiff became concerned that the plaintiff had engaged in credit card fraud and alerted the store manager, who escorted the plaintiff to his office at his request.  <u>Id.</u> at 339-40, 506 S.E.2d at 383.  An off-duty police officer who was employed by the company stood outside the office door.  <u>Id.</u>  When the plaintiff presented her driver's license and checkbook to the manager and the officer, she was accused of presenting "bogus" documents and informed that the store had lost thousands of dollars in inventory through theft.  <u>Id.</u>  After the confusion was resolved, the plaintiff left the manager's office.  <u>Id.</u>  Significant to the <u>Mitchell</u> court's decision to affirm the dismissal of the plaintiff's claim was the fact that she was never accused of a crime or threatened with

73

arrest.  Id. at 342, 506 S.E.2d at 385.  The court wrote, "Although Lowe's employees perhaps could have been more tactful in handling this situation, the conduct alleged does not rise to the level of 'unprovoked and unjustifiable opprobrious and insulting and abusive words by [an employee] tending to humiliate, mortify, and wound the feelings of the customer.'"  Id. (citation omitted).

The court finds that Plaintiff Carroll's claim of tortious misconduct is based on facts most similar to those in Mitchell.  Like the plaintiff in Mitchell, Carroll was not accused of any unlawful activity or threatened with arrest.  Carroll testified that during the entire incident, which last approximately twenty to thirty minutes, no one associated with the Tavern ever touched him or used any profanity, racial slurs, or other offensive or demeaning language.  [Carroll Dep. at 105, 124].  Plaintiffs were even offered a free round of drinks if they would be willing to give up their seats for two women who were standing at the bar.  [DSMFC ¶¶ 6, 7; DSMFS ¶¶ 6, 7; Carroll Dep. at 49-50, 95; Shaw Dep. at 60-61, 79; Kelly Dep. at 75-76].  Operating partner Heather Dennis spoke loudly during the incident, but the other Tavern employees did not raise their voices to Plaintiffs.  [Carroll Dep. at 96-97, 105; SSMF ¶ 40; CSMF ¶ 39; DSMFC ¶¶ 11, 15; DSMFS ¶ 13].  Finally, Carroll testified that when Officer Sanders escorted Plaintiffs out of the restaurant, he acted in a professional manner.

74

[Carroll Dep. at 113].  A reasonable jury could not find that Defendants' conduct constituted "'unprovoked and unjustifiable opprobrious and insulting and abusive words by [an employee] tending to humiliate, mortify, and wound the feelings of the customer.'"  <u>Mitchell</u>, 234 Ga. App. at 342, 506 S.E.2d at 385 (citation omitted); <u>accord</u> <u>Doe</u>, 202 Ga. App. at 617, 415 S.E.2d at 58.   The court, therefore, **RECOMMENDS** that Defendants' summary judgment motion [1:08-CV-2514, Doc. 112] be **GRANTED** on Plaintiff Carroll's state law claim for tortious misconduct and that this claim be dismissed with prejudice.

## V.    Conclusion

For all the foregoing reasons and legal authority, the undersigned **RECOMMENDS** that Defendants' motions [1:08-CV-2514, Doc. 112; 1:08-CV-2554, Doc. 100] for summary judgment be **DENIED** on Plaintiffs' § 1981 claims for racial discrimination in contractual relations, on their Title II claims for racial discrimination in a place of public accommodation, and on their Title II claims for injunctive relief. The undersigned further **RECOMMENDS** that Defendants' summary judgment motion [1:08-CV-2514, Doc. 112] be **GRANTED** on Plaintiff Carroll's state law claims for wrongful eviction, negligent or reckless infliction of emotional distress,

75

intentional infliction of emotional distress, and tortious misconduct and that these claims be **DISMISSED WITH PREJUDICE**.

The court **ORDERS** that Plaintiff Carroll's motion [1:08-CV-2514, Doc. 155] for an extension of time to file supplemental discovery materials and his motion [1:08-CV-2514, Doc. 157] to allow late-filed evidence are **GRANTED IN PART AND DENIED IN PART**[7] and that Defendants' motion [1:08-CV-2514, Doc. 154] to strike is **DENIED**.

The Clerk is **DIRECTED** to terminate this reference

**SO ORDERED AND RECOMMENDED** this 9th day of February, 2011.

_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE

---

[7]See Pages 36-38, supra.